**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

**TIMOTHY J. LEWIS,**
      **Plaintiff,**

**v.**                              **No:  5:07cv249/MCR/MD**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**
      **Defendant.**

_____

**REPORT AND RECOMMENDATION**

      **This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Rules 72.1(A), 72.2(D) and 72.3 of the local rules of this court relating to review of administrative determinations under the Social Security Act and related statutes.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying claimant Lewis' applications for disability insurance benefits and Supplemental Security Income (SSI) benefits under Titles II and XVI of the Act.**

      **Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.**

## PROCEDURAL HISTORY

Plaintiff filed applications for social security disability and SSI benefits, claiming an onset date of March 1, 1998.  The applications were denied initially and on reconsideration and plaintiff requested a hearing before an Administrative Law Judge (ALJ).   A hearing was held on March 18, 2005 at which plaintiff was represented by counsel and testified.  A vocational expert also testified.  The ALJ rendered an unfavorable decision on May 7, 2004 (tr. 11-18) and the Appeals Council declined review (tr. 3-4), making the decision of the ALJ the final decision of the Commissioner, and therefore subject to review in this court.  *Falge v. Apfel*, 150 F.3d 1320 (11th Cir. 1998).  This appeal followed.

## FINDINGS OF THE ALJ

Relative to the claims raised in this appeal, the ALJ found that plaintiff had a severe impairment of bipolar disorder, but that the impairment did not meet or equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; that plaintiff had the residual functional capacity to perform the exertional demands of sedentary work with little interaction with the public and supervisors and no work around hazardous machinery; that plaintiff's drug and alcohol problems were considered to be a material factor in his disability; that he was unable to perform any past relevant work; that he was a younger individual with a high school education; that transferability of job skills was not an issue; and that considering his age, education, work experience and residual functional capacity, there were jobs in significant numbers in the national economy that plaintiff could perform; and that he was not disabled as defined in the Act (tr. 13-18).

## STANDARD OF REVIEW

The ALJ's decision will be reversed only if it is not supported by substantial evidence.  *Falge, supra*.  The court must determine whether the Commissioner's

decision is supported by substantial evidence in the record and whether it is premised upon correct legal principles.  *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983).  In determining whether substantial evidence exists, the court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision.  *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)(citations omitted).  Findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  42 U.S.C. § 405(g); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(f), the Commissioner analyzes a claim in five steps.  A finding of disability or no disability at any step renders further evaluation unnecessary.  The steps are:

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairment?

3.    Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.    Does the individual have any impairments which prevent past relevant work?

5.    Do the individual's impairments prevent any other work?

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step 5 to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  *Chester v. Bowen*, supra, 792 F.2d at 131; *MacGregor v. Bowen*, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, claimant must prove that he cannot perform the work suggested by the Commissioner.  *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).

## PLAINTIFF'S MEDICAL HISTORY

Plaintiff's medical record begins on February 1, 2000, when he was seen at the Life Management Center of Northwest Florida (LMC) in Panama City, Florida.  He exhibited a depressed mood, flat affect, anhedonia, limited concentration and fluctuating energy level.  He was found to have bipolar disorder type I and a GAF[1] of 50.  He also admitted that he had been drinking during the previous month (tr. 214-15).  He returned on April 4, 2000, with agitated and irritable mental status.  He displayed hyperactivity, pressured speech, flights of ideas and racing thoughts. The possibility of auditory and visual hallucinations was noted. He reported that at the time he was basically homeless and would stay with friends when they would let

---

[1]    The Global Assessment of Functioning Scale (GAF) was designed by psychiatrists to rate the psychological, social land occupational functioning of an individual patient on a mental health scale of 0-100. On the GAF scale, 100 equals "superior functioning in a wide range of activities- no symptoms, with lesser functioning ability as the scale moves downward to 0."  A GAF of 50 indicates serious symptoms or impairments.

him.  He admitted that he drank occasionally to calm himself down.  The physician assessed bipolar disorder type I with rapid cycling and assigned a GAF of 50 (tr. 211-12).  Plaintiff returned to LMC on May 2, 2000 "greatly improved" with no agitation, irritability, or hyperactivity, and no pressured speech, flight of ideas, or racing thoughts.  His affect was appropriate, and concentration and energy levels were both "good."  Plaintiff denied helpless and hopeless feelings, and reported that his friends and family had also noticed significant improvement (tr. 210).  On July 18, 2000 an ARNP noted that plaintiff had been hospitalized in June because he had been found walking along the road intoxicated.  He had been treated and released, and was currently doing well. Examination showed "slightly" elevated mood with "some" pressured speech, but his affect was appropriate, and his concentration and energy levels were "good."   He also denied feelings of helplessness or hopelessness. His appearance, motor behavior, general attitude and behavior, mood and affect, quality and content of speech and thought, perception, orientation, and cognitive function were all "within normal limits."  (Tr. 206).

Five months later, on December 19, 2000, plaintiff returned in a depressed mood with some pressured speech.  He was assigned a GAF of 48 and his medications (which he had not been taking) were restarted (tr. 204).  He sought no further treatment until four months later, in April 2001, after being hospitalized for a Lithium overdose.  He reported that he stopped taking his Lithium, went into a manic state, and drank "at least a third to a fifth of liquor" followed by Lithium. He indicated that he did not drink except in his manic episodes.  After resuming his medications he reported feeling stable, and examination on that date was unremarkable (tr. 201-02).

Plaintiff returned two and one-half years later, in October 2003.  He reported that he had been in jail for two months, during which he was on a combination of Lithium, Seroquel and Klonopin.  After getting out of jail, five months prior, he stopped taking all of his medications due to being so happy that he was out of jail.

He admitted that he needed to be on medication.  On examination he was "quite cooperative," his speech was not pressured, conversation was goal oriented, and he appeared to be of average intellect.   His memory was intact, abstract logical thinking was intact, and his affect was appropriate.   Plaintiff reported racing thoughts and that he sometimes felt as if his mind was "too full," but there was no evidence of psychosis or thought disorder.  The assessment was bipolar disorder currently in a mixed phase and he was given a GAF of 50/50 (past 50/ present 50) (tr. 197-200).   On November 20, 2003, plaintiff's mood and affect were "slightly" depressed.   However, his appearance, motor behavior, general attitude and behavior, anxiety level, quality and content of speech and thought, perception, orientation, and cognitive function were all "within normal limits." (Tr. 193).  On December 18, 2003, plaintiff reported that he was still experiencing episodes of depression, but did not know how much of that was due to his being unemployed (tr. 194).  He had been looking for work since being released from jail seven months previously (tr. 194). On January 13, 2004, plaintiff reported that he had been helping his mother by cleaning the carpet and mopping floors. Examination showed he was "slightly" depressed, but was otherwise unremarkable (tr. 191-92).

Plaintiff returned to LMC on January 13, 2004 and February 10, 2004 for medication management (tr. 183, 184). On April 20, 2004 he presented to LMC in a depressive state, reporting that Abilify had him too down at times (tr. 179-80).  He was told to take half his dosage for a few days, and he was given samples of Zoloft (tr. 180).  He returned on June 15, 2004 still in a depressive state.  He reported that he had not tried the Zoloft because he was afraid that it might push him into a manic phase (tr. 181-82).

Plaintiff once again returned to LMC on August 16, 2004 in a depressive state. He reported that he had not been doing well since his last visit. He noted that the Abilify was making him too drowsy and the Zoloft upset his stomach. These were discontinued and the physician switched his medication back to Seroquel (tr. 177-

78). On September 13, 2004 plaintiff reported that the Seroquel was making him very drowsy and he was unable to concentrate. He was depressed and irritable, and admitted that he had recently been drinking. He agreed to try Geodon, and was given Klonopin to help reduce his irritability (tr. 176). Plaintiff returned to LMC on November 1, 2004 in the same depressed and irritable mood. He had not had the money to fill his Klonopin prescription since his last visit. He also reported that he did not notice any difference on the Geodon, and was told to increase his dosage of Geodon (tr. 174). He returned on December 13, 2004, reporting that he had not been doing well since his last visit. He tried upping his dosage of Geodon but it made him too sedated. He also reported that his moods were still variable. He was given samples of Lexapro (tr. 170-71). On January 3, 2005, he reported that the Lexapro made him feel as though he were on LSD and "tripping out." He was told to cut the Lexapro to 5 mg and the Geodon to 40 mg (tr. 169). On March 8, 2005, plaintiff reported that Klonopin worked well to calm him down when he got irritable (tr. 164). He denied any current medication side effects and did not want to make any medication changes (tr. 164).

On September 30, 2005, plaintiff came under the care of a new psychiatrist, Tommy Swiney, D.O. He reported that his manic symptoms had been stable, and that he had only needed to use his Klonopin sparingly. He denied current alcohol use and denied any medication side effects. Examination was unremarkable (tr. 150-51). On December 2, 2005, Dr. Swiney noted that plaintiff was "doing well." His only complaint was "some" decreased need for sleep and excessive motor activity secondary to running out of his medication, and Dr. Swiney provided some free samples. There were no other psychiatric complaints, and no depressive or psychotic symptoms. Examination was unremarkable. Dr. Swiney noted that plaintiff had been staying sober and they discussed long-term goals including going to school and possibly working with computers (tr. 149-50).

On December 30, 2005, and again on January 27, 2006, Dr. Swiney continued to note that plaintiff was "doing well," and that his compliance was "good," and mental examinations were unremarkable (tr. 143, 146-48).  On February 24, 2006, Dr. Swiney noted that plaintiff had developed some mixed symptoms of bipolar disorder, but that his compliance with taking his medication was "poor" (tr. 142).  By March 24, 2006, plaintiff's manic symptoms had improved and Dr. Swiney noted that he had been compliant (tr. 140).  Plaintiff continued to have some depressive symptoms, although examination showed no other abnormalities (tr. 139-40).  He denied medication side effects (tr. 140).  On April 21, 2006, Dr. Swiney noted that plaintiff continued to do well with his bipolar disorder, with improved interest, energy, concentration, and no suicidal ideation or thoughts of hopelessness.  Plaintiff also had no manic or psychotic symptoms.  He continued to have "some" irritability, but it was "much better controlled," and his examination was unremarkable (tr. 138-38A).

In addition to his treatment at LMC, plaintiff was examined by two psychologists at the request of the state agency or the Commissioner.  The first examination was on August 4, 2004, by Clell C. Warriner, Ph.D.  Dr. Warriner noted that plaintiff reported having numerous trips to inpatient care, approximately 5 in the past few years.  He also noted that plaintiff's concentration appeared to be adequate but his thinking had an odd quality typical of most schizophrenaform complexes. He also reported that even though plaintiff had been treated for bipolar disorder with Lithium, it had not brought about a cessation of his symptomology and that his manic states were regularly accompanied by beer drinking.  Dr. Warriner felt that the appropriate diagnosis was cyclothymiac mood swings and schizo-affective schizophrenia with a GAF of 46.  He also opined that if plaintiff was awarded funds that someone, such as his mother, should manage them for him  (tr. 90-91).

The second examination was by Robert S. Kline, III, Psy.D., who saw plaintiff on March 6, 2007.  Dr. Kline noted that plaintiff's motor activity was somewhat excessive and he was shaking his hands during the interview.  He seemed easily

distracted and was difficult for him to remain focused in one topic while answering questions.  His mood expression was considered to be moderately anxious and excessive psychomotor agitation was noticed.  Dr. Kline's diagnostic impression was bipolar disorder, mixed, with a GAF of 65.  Like Dr. Warringer, he felt that if funds were awarded to plaintiff his mother should manage them.  Dr. Kline also filled out a Medical Source Statement of Ability to Do Work-Related Activities (Mental). He opined that plaintiff's condition moderately affected his ability to make judgements on simple work-related decisions, to respond appropriately to work pressure in a usual work setting and to respond appropriately to changes in a routine work setting, but that there was no limitation on plaintiff's ability to understand and remember or carry out either  simple or detailed instructions (tr. 224-230).

On October 12, 2004, a Psychiatric Review Technique form was completed by state agency physician, Jane F. Cormier, Ph.D.  She opined that plaintiff suffered from an affective disorder, substance addiction disorder and bipolar disorder.  She felt that these disorders would cause him to have moderate difficulties in maintaining social functioning and in maintaining concentration, persistence and pace.  She further opined that plaintiff had below average intellectual functioning (tr. 92-105).  Dr. Cormier also completed a Mental Residual Functional Capacity Assessment form on October 12, 2004.  In her opinion, plaintiff had moderate limitations in his ability to maintain attention and concentration for extended periods; moderate limitations in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and moderate limitations in his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, and that overall he had the ability to perform routine, repetitive tasks on a sustained basis (tr. 106-109).

Case No: 5:07cv249/MCR/MD

On February 16, 2005, a second Psychiatric Review Technique form was completed by state agency physician, Eric D. Martin, Ph.D.  Like Dr. Cormier, he opined that plaintiff suffered from an affective disorder, substance addiction disorder and bipolar disorder, and that these disorders would cause plaintiff to have moderate difficulties in maintaining social functioning and in maintaining concentration, persistence and pace.  He also noted that plaintiff suffered from intermittent alcohol abuse disorder.  Dr. Martin also completed a Mental Residual Functional Capacity Assessment form on February 16, 2005.  He opined that plaintiff had moderate limitations in his ability to maintain attention and concentration for extended periods; moderate limitations in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and moderate limitations in his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  In all other categories plaintiff was not significantly limited  (tr. 126- 34).

## DISCUSSION

The plaintiff argues that the ALJ erred in rejecting the testimony of the vocational expert, in not articulating how alcohol was a material factor in plaintiff's condition, and in failing to address plaintiff's GAF scores, and that plaintiff was disabled from his onset date as a matter of law.  The Commissioner argues that the ALJ's findings were supported by substantial evidence and must, therefore, be sustained.  The issue thus presented is whether the ALJ's decision that the plaintiff was not disabled, in light of his physical and mental condition, age, education, work experience, and residual functional capacity, is supported by substantial evidence in the record.

1.      <u>Vocational expert testimony.</u>

Plaintiff first contends that the ALJ did not rely on appropriate hypothetical questions and responses from the vocational expert.  The respondent argues that this is incorrect - that one of the hypothetical questions included those impairments the ALJ found credible.  A hypothetical question must comprehensively describe the plaintiff's condition, and vocational expert testimony that does not accurately address that condition cannot be considered substantial record evidence.  *Pendley v. Heckler,* 767 F.2d 1561, 1563 (11th Cir. 1985).  However, "the ALJ [is] not required to include findings in the hypothetical that the ALJ had properly rejected as unsupported."  *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1161 (11th Cir. 2004).  The matter before this court is simply to compare the ultimate findings of the ALJ with the hypothetical questions posed.

The examination of the vocational expert was somewhat rambling, so what follows are not direct quotes (except where noted).  The gist of the questions and answers were as follows:

Q:      [Hypothetical No. 1]  Assume a 30 year old at the time of onset, with a twelfth grade education who can read and write English, and has no physical limitations.

A:      Such a person could return to plaintiff's past relevant work.

Q:      [No. 2]  Same person, but with "a history of as yet to be controlled mood swings [and] a history of losing their temper, which manifest (sic) itself occasionally into a violent reaction."

A:      Such a person could not do his past relevant work.

Q:      Could that person do any other work?

A:      Not on a competitive basis.  Possibly in a sheltered workshop.

Q:      [No. 3]  Same as No. 1 but medications make them drowsy, sleepy.

A:      "Well, certainly [INAUDIBLE] you know and degrees of drowsy and sleepy but if a physician felt or you know, you felt that still a work - -

eight-hour workday with not being capable - - or not being around hazardous moving machinery.  Definitely unskilled work . . . .  If there still was an eight-hour capacity you'd want to be in a you know, a very safe environment and a - - without any lifting heavy things.  Definitely in the light to sedentary range.  And also in the unskilled range."

Q:     [No. 4]  What sedentary jobs would be available for someone who should not be around heavy machinery, or heights and climbing and such with medications that occasionally make them drowsy?

A:     Such a person could do something very simple, like an addresser (mass marketing envelope stuffer).

Q:     [No. 5]  How much does that job put you working with co-workers?

A:     That is done with little contact with other people.

Q:     Any others?

A:     Table worker.  Not a lot of communication with co-workers.

(Tr. 257-61).  The vocational expert also explained that the two jobs identified existed in significant numbers in the economy.

The ALJ's finding was that "claimant has the residual functional capacity to perform the exertional demands of sedentary work with little interaction with the public and supervisors; and no work around hazardous machinery."  (Tr. 14).  In reaching her determination the ALJ found that plaintiff's claimed symptoms were not as severe as he claimed.  Specifically, she noted that Dr. Warriner and Dr. Kline assessed no more than moderate restrictions, and that the LMC records showed that when plaintiff was not drinking and was compliant with his medications he did well (tr. 15-16).  After carefully reviewing the foregoing testimony and comparing it with the ALJ's findings, the undersigned concludes that the hypothetical questions adequately described the plaintiff as the ALJ ultimately found him.  Hypothetical Nos. 1, 3 and 4 set the conditions of no physical limitations but with drowsiness and not working around machinery, and No. 5, which was not stated precisely as a

hypothetical but which contained the assumption that the person should not work closely with others, contained the last part of the ALJ's finding - that plaintiff should have little interaction with the public and supervisors.  Admittedly the examination could have been done with a little more precision, but the examination questions and answers were sufficient to meet the *Pendley* requirement of comprehensively describing the plaintiff's condition as ultimately determined.  That determination was supported by the medical evidence from the examining physicians and the treating physician records from LMC.  Consequently, the plaintiff has not shown error, and is not entitled to reversal on this ground.

  2. <u>Alcohol.</u>

   Plaintiff next contends that the ALJ erred in not adequately explaining how she found that his alcohol problems were a material factor in his lack of disability. Title 42 U.S.C. § 423(d)(2)(C) provides that as to both disability benefits and SSI claims, "[an] individual shall not be considered to be disabled for purposes of this title if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."  The Commissioner has interpreted the language of the statute by finding that drug addiction or alcoholism is "material" if the individual would not be found disabled if alcohol or drug use were to cease.  20 C.F.R. §§ 404.1535, 416.935. The claimant has the burden of proving that he would still be disabled even if he were to stop using alcohol or drugs.  *Doughty v. Apfel,* 245 F.3d 1274 (11th Cir. 2001). Therefore, plaintiff is not entitled to benefits if alcoholism or drug addiction was found by the ALJ to be material to the determination that plaintiff was disabled, and if the ALJ's determination was supported by substantial record evidence.

   That is not exactly what happened here, because the ALJ found that plaintiff was not disabled based on the residual functional capacity she found.  In other words, she had substantial record evidence upon which she found that his overall complaints were not credible.  She did not need to find that alcohol was a factor in his disability because she found that he was not disabled.

In any event, if alcohol was a factor, it came into play in the ALJ's review of the medical records. The ALJ noted that plaintiff admitted that he drank and did not take his medication when he was drinking, but the record clearly showed that when plaintiff was not drinking and was compliant, he did well (tr. 17). Indeed, based on the record the ALJ would have been justified in finding that plaintiff was disabled, but that any disability was caused by consumption of alcohol, thereby denying him benefits under 42 U.S.C. § 423(d)(2)(C). It would have been clearer if the ALJ had found that plaintiff was disabled when he drank, but was not disabled when he was sober, but she took a slightly different tack. The result is the same. Plaintiff did well when he did not drink, which made drinking material to his condition, and he was not disabled when he remained sober, as he was during the period when he was being treated by Dr. Swiney, from September 2005 through April 2006, when the medical record ended. Throughout that period Dr. Swiney reported that plaintiff was compliant, was not drinking, and was doing well. The record clearly supports the ALJ's ultimate finding, and plaintiff is not entitled to reversal on this ground.

      3.    <u>GAF scores.</u>

Finally, plaintiff contends that the ALJ erred in not considering his GAF scores. As noted above, the GAF score was designed by psychiatrists to rate the psychological, social and occupational functioning of an individual patient on a mental health scale of 0-100. On the GAF scale, 100 equals "superior functioning in a wide range of activities- no symptoms," with lesser functioning ability as the scale moves downward to 0. A GAF of 50 indicates serious symptoms or impairments. Plaintiff says that his GAF scores of 50 were strongly indicative of disability, but he neglects much of the record. As with the foregoing section, plaintiff's GAF scores were low when he was drinking and was not taking his medication. Although not specifically stated, they clearly improved when he was sober and compliant under Dr. Swiney's care or he could not have been characterized as "doing well." Consequently, there was no error and plaintiff is not entitled to reversal on this ground.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED** and that the clerk be directed to close the file.

At Pensacola, Florida this 13th day of August, 2008

/s/ *Miles Davis*
**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  See 28 U.S.C. § 636;** *United States v. Roberts***, 858 F.2d 698, 701 (11th Cir. 1988).**